IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PERSONALWEB TECHNOLOGIES, LLC, a Texas limited liability company, and LEVEL 3 COMMUNICATIONS, LLC, a Delaware limited liability company, <br><br> Plaintiffs, <br><br> v. <br><br> KARMA MOBILITY INC., a Delaware corporation, <br><br> Defendant. | Civil Action No. 18-cv-134-GMS <br><br><br> **JURY TRIAL DEMANDED** |

## FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff PersonalWeb Technologies, LLC ("Plaintiff" or "PersonalWeb") files this First Amended Complaint for patent infringement against Defendant Karma Mobility Inc. ("Defendant").  Plaintiff PersonalWeb Technologies, LLC alleges:

## PRELIMINARY STATEMENT

1.      PersonalWeb and Level 3 Communications, LLC ("Level 3") are parties to an agreement between Kinetech, Inc. and Digital Island, Inc. dated September 1, 2000 (the "Agreement").  Pursuant to the Agreement, PersonalWeb and Level 3 each own a fifty percent (50%) undivided interest in and to the patents at issue in this action:  U.S. Patent Nos. 6,928,442; 7,802,310, 7,945,544 and 8,099,420 ("Patents-in-Suit").   Level 3 has joined in this First Amended Complaint pursuant to its contractual obligations under the Agreement, at the request of PersonalWeb.

2.      Pursuant to the Agreement, Level 3 has, among other rights, certain defined rights to use, practice, license, sublicense and enforce and/or litigate the Patents-in-Suit in connection with a particular field of use ("Level 3 Exclusive Field").   Pursuant to the Agreement

PersonalWeb has, among other rights, certain defined rights to use, practice, license, sublicense, enforce and/or litigate the Patents-in-Suit in fields other than the Level 3 Exclusive Field (the "PersonalWeb Patent Field").

3.      All infringement allegations, statements describing PersonalWeb, statements describing any Defendant (or any Defendant's products) and any statements made regarding jurisdiction and venue are made by PersonalWeb alone, and not by Level 3.   PersonalWeb alleges that the infringements at issue in this case all occur within, and are limited to, the PersonalWeb Patent Field.  Accordingly, PersonalWeb has not provided notice to Level 3–under Section 6.4.1 of the Agreement or otherwise–that PersonalWeb desires to bring suit in the Level 3 Exclusive Field in its own name on its own behalf or that PersonalWeb knows or suspects that Defendant is infringing or has infringed any of Level 3's rights in the patents.

## THE PARTIES

4.      Plaintiff PersonalWeb Technologies, LLC is a limited liability company duly organized and existing under the laws of Texas with its principal place of business at 112 E. Line Street, Suite 204, Tyler, TX 75702.

5.      Plaintiff Level 3 Communications, LLC is a limited liability company organized under the laws of Delaware with its principal place of business at 100 CenturyLink Drive, Monroe, Louisiana, 71203.

6.      PersonalWeb's infringement claims asserted in this case are asserted by PersonalWeb and all fall outside the Level 3 Exclusive Field.  Level 3 is currently not asserting patent infringement in this case in the Level 3 Exclusive Field against any Defendant.

7.      Defendant Karma Mobility Inc. is, upon information and belief, a Delaware corporation having a principal place of business or regular and established place of business at 2300 Valley View Lane, Suite 200, Irving, Texas 75062.

## JURISDICTION AND VENUE

8.      The court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the patent laws of the United States, 35 U.S.C. §§ 1 *et*

*seq.*

9.     This court has personal jurisdiction over Defendant Karma Mobility Inc. because, on information and belief, Defendant Karma Mobility Inc. is a resident of this district, being incorporated in the State of Delaware.

10.     Venue is proper in this federal district pursuant to 28 U.S.C. §§ 1391(b)-(c) and 1400(b) because Defendant Karma Mobility Inc. is incorporated in the State of Delaware. Further, on information and belief, Defendant has done business in this District and has committed acts of infringement in this District, entitling PersonalWeb to relief in this District.

## PERSONALWEB BACKGROUND

11.     The Patents-in-Suit cover fundamental aspects of cloud computing, including the identification of files or data and the efficient retrieval thereof in a manner which reduces bandwidth transmission and storage requirements.

12.     The ability to reliably identify and access specific data is essential to any computer system or network.  On a single computer or within a small network, the task is relatively easy:  simply name the file, identify it by that name and its stored location on the computer or within the network, and access it by name and location.  Early operating systems facilitated this approach with standardized naming conventions, storage device identifiers, and folder structures.

13.     Ronald Lachman and David Farber, the inventors of the Patents-in-Suit, recognized that the conventional approach for naming, locating, and accessing data in computer networks could not keep pace with ever-expanding, global data processing networks.  New distributed storage systems use files that are stored across different devices in dispersed geographic locations.  These different locations could use dissimilar conventions for identifying storage devices and data partitions.  Likewise, different users could give identical names to different files or parts of files–or unknowingly give different names to identical files.  No solution existed to ensure that identical file names referred to the same data, and conversely, that different file names referred to different data.  As a result, expanding networks could not only

become clogged with duplicate data, they also made locating and controlling access to stored data more difficult.

14.     Lachman and Farber developed a solution: replacing conventional naming and storing conventions with system-wide "substantially unique," content-based identifiers.  Their approach assigned substantially unique identifiers to all "data items" of any type–"the contents of a file, a portion of a file, a page in memory, an object in an object-oriented program, a digital message, a digital scanned image, a part of a video or audio signal, or any other entity which can be represented by a sequence of bits."  Applied system-wide, this invention would permit any data item to be stored, located, managed, synchronized, and accessed using its content-based identifier.

15.     To create a substantially unique, content-based identifier, Lachman and Farber turned to cryptography.  Cryptographic hash functions, including MD4, MD5, and SHA, had been used in computer systems to verify the integrity of retrieved data–a so-called "checksum." Lachman and Farber recognized that these same hash functions could be devoted to a vital new purpose: if a cryptographic hash function was applied to a sequence of bits (a "data item"), it would produce a substantially unique result value, one that: (1) virtually guarantees a different result value if the data item is changed; (2) is computationally difficult to reproduce with a different sequence of bits; and (3) cannot be used to recreate the original sequence of bits.

16.     These cryptographic hash functions would thus assign any sequence of bits, based on content alone, with a substantially unique identifier.  Lachman and Farber estimated that the odds of these hash functions producing the same identifier for two different sequences of bits (i.e., the "probability of collision") be about 1 in 2 to the 29th power.  Lachman and Farber dubbed their content-based identifier a "True Name."

17.     Using a True Name, Lachman and Farber conceived various data structures and methods for managing data (each data item correlated with a single True Name) within a network—no matter the complexity of the data or the network.  These data structures provide a key-map organization, allowing for a rapid identification of any particular data item anywhere in

a network by comparing a True Name for the data item against other True Names for data items already in the network.  In operation, managing data using True Names allows a user to determine the location of any data in a network, determine whether access is authorized, and to selectively provide access to specific content not possible using the conventional naming arts.

18.     On April 11, 1995, Lachman and Farber filed their patent application, describing these and other ways in which content-based "True Names" elevated data-processing systems over conventional file-naming systems.  The first True Name patent issued on November 2, 1999.  The last of the Patents-in-Suit has expired, and the allegations herein are directed to the time period before expiration of the last of the Patents-in-Suit.

19.     PersonalWeb has successfully enforced its intellectual property rights against third party infringers, and its enforcement of the Patents-In Suit is ongoing.  This enforcement has resulted in PersonalWeb obtaining settlements and granting non-exclusive licenses regarding the Patents-in-Suit.

## DEFENDANT'S BACKGROUND

20.     On information and belief, Defendant operates or has operated a website located at **yourkarma.com**, and has done so since before expiration of the last to expire of the Patents-in-Suit, which has operated to provide webpage content to its authorized users in the manner herein described.[1]  On information and belief, Defendant's webpage servers utilized a system of notifications and authorizations to control the distribution of content, *e.g.*, what webpage content may be served from webpage servers and intermediate caches and what webpage content a user's browser is authorized to use to render Defendant's webpage(s).  On information and belief, Defendant's system and its associated method of providing webpage content, used conditional GET requests with If-None-Match headers and associated ETag values for various index and/or asset files required to render various webpages of the Defendant.  In this manner, Defendant's

---

[1] While the First Amended Complaint is sometimes written in the present or present perfect tense, and though it is believed that Defendant's systems and methods operate in substantially the same manner currently, all specific allegations are directed to the system's operations and the method's performance in the relevant time period.

system and associated method forced both intermediate cache servers and endpoint caches to check whether they were still authorized to access the previously cached webpage files of Defendant, or whether they were required to access newly authorized content in rendering Defendant's webpage.

21.     On information and belief, Defendant has thereby reduced the bandwidth required and the amount of data to be served from origin servers or intermediate cache servers to field user requests to render Defendant's webpages, because such servers only need to serve files whose content has changed.  This has allowed for the efficient update of cached information only when such content has changed, thereby reducing transaction overhead and allowing the authorized content to be served from the nearest cache.

22.     On information and belief, Defendant's website used a Ruby on Rails architecture to develop and compile various webpages of the Defendant, including asset files that were used in rendering the webpages, and to generate a fingerprint of the content of asset files when the webpages were compiled.  On information and belief, the fingerprint of individual asset files that were part of the webpage's content were included in the filenames of the individual asset files. On information and belief, the modified filenames were then used as part of the Uniform Resource Identifier ("URI") used to access the individual asset files over the Internet.   On information and belief, when an asset file's content was changed, a new fingerprint was generated and included in the filename, its URI thus being changed accordingly.  On information and belief, the asset file fingerprint was generated with a message digest hash function and used to indicate content changes.  Furthermore, asset file URIs (with such fingerprints) were included in index files, which were recompiled when any URI changed due to a fingerprint change.  Thus, a content change in an asset file for a given webpage would result in a change to its fingerprint, its URI, and consequently a content change to the index file for that webpage.

23.     On information and belief, Defendant contracted with Amazon to use Amazon's S3 system to store and serve Defendant's webpage content on its behalf, including certain automation features to perform certain accused steps of the method and operate certain accused

portions of the system on its behalf.  On information and belief, once Defendant's webpage files were compiled and are complete, Defendant uploaded them to an Amazon S3 host system as objects.  On information and belief, Defendant directed and/or controlled the uploading of its files and subsequent actions that occur on the S3 host system due to Defendant's choice of using content-based identifiers, e.g., ETags of content of index and asset files used in rendering Defendant's webpages so that Defendant could control Defendant's content distribution in an infringement of the Patents-In-Suit in the manner specified herein.

24.     On information and belief, an object's value comprised a sequence of bits and, upon upload, on Defendant's behalf, an object's associated ETag value was generated by the S3 host system by applying a hash function to the sequence of bits; wherein any two objects comprising identical sequences of bits had identical associated ETag values.  Thus, on information and belief, when an object's content was changed, uploaded to the S3 host system, and a new associated ETag value was generated on Defendant's behalf, it authorized or disallowed the respective service or use of the object's content by intermediate cache servers and endpoint caches such as browser caches.

25.     On information and belief, Defendant's webpages generally each comprised an index file and one or more asset files.  The index file contained URIs for asset files needed to render the webpage to be loaded, where each of these files is uploaded as an individual object with its own URI.

26.     On information and belief, when an intermediate cache server or an endpoint browser requested a webpage of the Defendant for the first time, it sent a Hyper Text Transfer Protocol ("HTTP") GET request with the webpage's URI and Defendant's origin server or an upstream cache server responded by sending an HTTP 200 message containing the index file for the webpage, along with its respective associated ETag.  On information and belief, the intermediate cache server or an endpoint browser then sent individual HTTP Get requests, each with an asset URI that was contained in the index file, and Defendant's origin server or an upstream cache server responded by sending individual HTTP 200 messages containing the

requested asset files, along with their respective associated ETags.  On information and belief, upon receipt of the HTTP 200 messages, the intermediate cache server or endpoint browser cached the index and asset files with their associated URI and associated ETag values and the browser used them in rendering the requested web page of the Defendant.  On information and belief, the intermediate cache servers and browser caches were caused to maintain databases/tables which mapped the URIs of asset/index files to their respective responses and, if applicable, associated cache-control headers and ETags.

27.     On information and belief, in at least some instances, such HTTP 200 messages included "cache-control" headers containing "max-age" directives and/or "expires" headers.  On information and belief, such HTTP 200 messages may also have included "cache-control" headers containing a "must-revalidate" directive.

28.     On information and belief, by responding to an HTTP GET request for a given webpage by sending down content of an index/asset file with an associated ETag, Defendant has allowed or has forced the browser cache and all intermediate cache servers, the next time that they are called to use that content, to use the ETag in an HTTP conditional GET request with a "If-None-Match" header to re-verify that they are still authorized to serve or use that content, or whether they are not still authorized to use that content and must use new content, in the manner as follows.

29.     On information and belief, Defendant had the ability to stop or limit when an intermediate cache or endpoint browser could have or must have used an ETag to reauthorize its use of cached index/asset files of the Defendant website owner.  On information and belief, Defendant did this, for example, by causing "max-age" or other directives in "cache-control" headers to be included in HTTP responses containing its index/asset files.  On information and belief, because Defendant could bypass the use of the ETag completely through the use of such commands, it controlled whether or not the claimed system and the claimed method were used at all in the service of their webpage content by S3.  On information and belief, Defendant benefits from using the ETags to control the distribution of its webpage content by communicating to a

downstream cache and to an endpoint browser which of Defendant's cached webpage files it is reauthorized to serve/use and what newly authorized files it must first obtain in serving/rendering Defendant's webpages.

30.     On information and belief, when an endpoint browser again requested the Defendant's webpage, according to the cache-control headers previously received with the webpage's index file, the endpoint browser sent a conditional GET 'If-None-Match' request using the associated ETag value and the URI for the index file so as to be notified whether the browser still has Defendant's authority to render the webpage with its locally cached index file for that webpage.

31.     On information and belief, a responding intermediate cache server, according to the cache-control headers, having an ETag for that URI responded to the request by determining whether it had the same associated ETag value in its list of associated ETag values (if it had no ETag value for that URI, the request was passed up to an upstream intermediate cache server capable of responding or, if none, to the Defendant's origin server which performed the response).

32.     On information and belief, if the responding server had webpage content for that URI and there was a match between the ETag it received in the request with the ETag it currently had associated for that URI, it sent back an HTTP 304 message; this message notifying the browser that the same webpage content was present at the responding server and that the browser was still authorized to again use the previously cached index file to render the webpage.  On information and belief, upon receipt of the HTTP Protocol 304 response, the browser accessed the locally cached index file in rendering the webpage.

33.     On information and belief, if the index file's associated ETag sent by the endpoint browser in the 'If-None-Match' request did not match the associated ETag maintained at the responding server (or other upstream intermediate cache servers or the origin server) for that URI, the responding server sent back an HTTP 200 response along with the new index file along with its new ETag value.  The HTTP 200 response indicated to the browser that it was not

authorized to use (or serve, in the case of an intermediate cache server receiving the HTTP 200 message) the previously cached index file.  In response to receiving the HTTP 200 message, the endpoint browser (or intermediate cache server) was forced to update their respective caches with the new index file and associated ETag.  The browser read the new index file to identify the asset file URIs contained therein.

34.     On information and belief, for particular asset file URIs for which there was an entry in the endpoint browser and the cache entry included an associated ETag value, according to the cache-control headers previously received with such asset file, the endpoint browser likewise sent an "If-None-Match" conditional GET request with the URI and associated ETag. On information and belief, according to the cache-control headers, if the responding server had an ETag value for that URI, the responding server compared the associated ETag value received in the conditional GET with of the associated ETag for that URI.  On information and belief, if there was a match, then the responding server sent an HTTP 304 message and associated ETag value, which reauthorized the browser to use the previously cached content of that asset file to render the webpage.  If there was not a match, the responding server sent an HTTP 200 message with the new content for that asset file and its new associated ETag value.  The HTTP 200 message directed the downstream server or the browser that it was not authorized to access the previously cached content for that URI to serve it or to render the webpage.  Rather, in response to receiving such a message, the browser accessed the new asset file content provided in the HTTP 200 message in rendering the webpage.  Thusly the end cache and the intermediate caches in the network updated their respective databases to map the new URI to the new content and ETag value.

35.     On information and belief, for particular asset file URIs in the index file for which there was an entry in the endpoint browser's cache and the cache entry did not include an associated ETag values, the browser was allowed to use the content, subject to the cache-control headers, previously received with such asset file.  If the cache-control headers did not allow the cached asset to be used or if there was no entry in the endpoint browser's cache for the asset

file's URI, the browser sent an HTTP GET request with the asset file's URI; and the responding intermediate or origin server responded to the GET request by sending the asset file for that URI and, if any, the corresponding cache-control header and/or associated ETag with an HTTP 200 message.   On information and belief, in response to receiving the HTTP 200 message, the browser cached the asset file, if any, and its cache-control header and/or associated ETag and used the newly received asset files in rendering Defendant's webpage.   On information and belief, when the downstream intermediate cache or the browser was later required to again render the webpage, it went through the above process to determine which file content it still had authority to access or whether it needed to access different authorized content to render the webpage via the HTTP 304 and HTTP 200 messages.

36.     On information and belief, the browser repeated this process for various asset files for which it had an associated ETag value and asset files with URIs in the index file.

37.     On information and belief, in this manner, Defendant used (1) ETag values and (2) asset files referenced by URIs with fingerprints based on the asset files' content: to control the behavior of downstream intermediate cache servers and endpoint caches to make sure that they only accessed and used Defendant's latest authorized webpage content to serve or to render their webpages.

## FIRST CLAIM FOR RELIEF

## INFRINGEMENT OF U.S. PATENT NO. 6,928,442

38.     PersonalWeb repeats and realleges paragraphs 1-37, as if the same were fully stated herein.

39.     On August 9, 2005, United States Patent No. 6,928,442 (the "'442 patent") was duly and legally issued for an invention entitled "Enforcement and Policing of Licensed Content Using Content-Based Identifiers."  PersonalWeb has an ownership interest in the '442 patent by assignment, including the exclusive right to enforce the '442 patent within the PersonalWeb Patent Field, and continues to hold that ownership interest in the '442 patent.  A true and correct copy of the '442 patent is attached hereto as Exhibit A.

40.     Defendant has infringed at least claims 10 and 11 of the '442 patent by its manufacture, use, sale, importation, and/or offer for sale of products or services, and/or controlling the distribution of its webpage content in the manner described herein.  Defendant's infringement is literal and/or under the doctrine of equivalents and Defendant is liable for its infringement of the '442 patent pursuant to 35 U.S.C. § 271.

41.     For example, claim 10 covers "a method, in a system in which a plurality of files are distributed across a plurality of computers."  On information and belief, Defendant has used a system of notifications and authorizations to distribute a plurality of files, *e.g.*, Defendant's files containing content necessary to render its webpages, across a plurality of computers such as production servers, origin servers, intermediate cache servers and endpoint caches used by browsers rendering Defendant's webpages.

42.     Claim 10 then recites the act of "obtaining a name for a data file, the name being based at least in part on a given function of the data, wherein the data used by the function comprises the contents of the particular file."  As set forth above, on information and belief, Defendant generated or otherwise obtained ETags and fingerprints in URIs for its index and asset files used to render its webpages using a hash function, wherein the ETag and fingerprint in the URI were based on the contents of the particular file.  Moreover, Defendant caused the intermediate caches servers and endpoint caches to obtain the ETags and URIs (which contain the fingerprint) in HTTP 200 messages sent from Defendant's origin servers.  On information and belief, Defendant caused intermediate cache servers and its origin servers to obtain ETags and URIs (which contain the fingerprint) in conditional GET messages from endpoint and intermediate caches, as described *supra*.

43.     Claim 10 then recites the act of "determining, using at least the name, whether a copy of the data file is present on at least one of said computers."  On information and belief, as set forth above, Defendant has caused its origin severs and the intermediate cache servers between an endpoint cache and one of its origin servers to, in response to receiving a conditional GET request with an If-None-Match header, determine whether it has a file present that matches

the URI (which contained the fingerprint) in the conditional GET and to compare the ETag in the conditional GET to the ETag for that URI and determine whether a copy of the content having that ETag is present.  Moreover, Defendant has caused browsers at the endpoint cache to determine, using the fingerprint the URI of an asset file, whether it had a cached copy of the corresponding asset file.

44.   Claim 10 then recites the act of "determining whether a copy of the data file that is present on a at least one of said computers is an unauthorized copy or an unlicensed copy of the data file."  On information and belief, as set forth above, if there was a match, and it was determined that the max-age value was unexpired and/or after any further reauthorization check required by other directives set by Defendant via "cache-control" headers, the origin or intermediate cache server determined that the copy of the file present at the downstream intermediate cache server and/or the endpoint cache was an authorized or licensed copy of the data file.  Conversely, if there was no match, it determined that the copy of the file present at the downstream intermediate cache server and/or the endpoint cache was an unauthorized or unlicensed copy of the data file.  Likewise, if the browser determined that it had a file with a matching URI, and its max-age value was unexpired and/or after any further reauthorization check required by Defendant via other directives in "cache-control" headers, the browser determined that it was still authorized to use that file.

45.   Defendant's acts of infringement caused damage to PersonalWeb and PersonalWeb is entitled to recover from Defendant the damages sustained by PersonalWeb as a result of Defendant's wrongful acts in an amount subject to proof at trial.

## SECOND CLAIM FOR RELIEF

## INFRINGEMENT OF U.S. PATENT NO. 7,802,310

46.   PersonalWeb repeats and realleges paragraphs 1-37, as if the same were fully stated herein.

47.   On September 21, 2010, United States Patent No. 7,802,310 (the "'310 patent") was duly and legally issued for an invention entitled "Controlling Access to Data in a

Data Processing System."  PersonalWeb has an ownership interest in the '310 patent by assignment, including the exclusive right to enforce the '310 patent within the PersonalWeb Patent Field, and continues to hold that ownership interest in the '310 patent.  A true and correct copy of the '310 patent is attached hereto as Exhibit B.

48.    Defendant has infringed at least claims 20 and 69 of the '310 patent by its manufacture, use, sale, importation, and/or offer for sale of products or services, and/or controlling the distribution of its webpage content in the manner described herein.  Defendant's infringement is literal and/or under the doctrine of equivalents and Defendant is liable for its infringement of the '310 patent pursuant to 35 U.S.C. § 271.

49.    For example, claim 20 covers a "computer-implemented method operable in a system which includes a plurality of computers."  On information and belief, Defendant used the claimed computer implemented method by using a system of notifications and authorizations to control the distribution of data items, such as various index and asset files, necessary to render its webpages, across a plurality of computers such as production servers, origin servers, intermediate cache servers, and endpoint caches.

50.    Claim 20 then recites "controlling distribution of content from a first computer to at least one other computer, in response to a request obtained by a first device in the system from a second device in the system, the first device comprising hardware including at least one processor, the request including at least a content-dependent name of a particular data item, the content-dependent name being based at least in part on a function of at least some of the data comprising the particular data item, wherein the function comprises a message digest function or a hash function, and wherein two identical data items will have the same content-dependent name."  On information and belief, as set forth above, Defendant has caused downstream intermediate cache servers and endpoint caches to send conditional GET requests with If-None-Match headers containing ETags that are fielded by upstream cache or origin servers.  On information and belief, the ETags were content-dependent names for a data item based on hashing the data item's contents; and when the file's content changed a new content-dependent

name was determined.  On information and belief, in Defendant's method, a first computer, such as the intermediate cache server or origin server, received such conditional GET requests from a second computer, such as a user browser or other intermediate cache server, regarding data items, such as index or asset files, the requests including ETags associated with the respective data items.

51.     Claim 20 then recites "based at least in part on said content-dependent name of said particular data item, the first device (A) permitting the content to be provided to or accessed by the at least one other computer if it is not determined that the content is unauthorized or unlicensed, otherwise, (B) if it is determined that the content is unauthorized or unlicensed, not permitting the content to be provided to or accessed by the at least one other computer."  On information and belief, the first computer, such as an upstream intermediate cache server or origin server, maintained a plurality of ETags associated with Defendant's asset and index files On information and belief, the ETag in a request and the ETag maintained by the first computer for the particular data item sought by the request were compared to determine whether the associated content present at the downstream computer was still authorized to be used/served or whether new authorized content must be provided thereto.  If it was determined that the data item corresponding to the received ETag was still authorized to be used, the first computer sent back an HTTP 304 message authorizing the downstream cache server or end-user cache to access the file content already present in order to serve it or to use it to render the webpage.  On information and belief, if it had been determined that the data item corresponding to received E-tag was no longer authorized, the first computer sent back an HTTP 200 message which indicated to the downstream cache server or end-user cache that was not authorized to access the old content and must access the new authorized file content contained in the HTTP 200 message to serve it or to use it to render the webpage.

52.     For further example, claim 69 covers a "system operable in a network of computers, the system comprising hardware including at least a processor, and software, in combination with said hardware."  On information and belief, Defendant has controlled the

distribution of its website content across a system that included a network of computers, such as its production servers as well as origin servers, intermediate cache servers, and endpoint caches, all comprising hardware including a processor.  On information and belief, Defendant has utilized software, in combination with such hardware, such as Ruby on Rails, software utilized in implementing the HTTP web protocol, and software used on the Amazon S3 host servers that Defendant used to serve its content.

53.    Claim 69 then recites the system "(a) to receive at a first computer, from a second computer, a request regarding a data item, said request including at least a content-dependent name for the data item, the content-dependent name being based at least in part on a function of the data in the data item, wherein the data used by the function to determine the content-dependent name comprises at least some of the contents of the data item, wherein the function that was used is a message digest function or a hash function, and wherein two identical data items will have the same content-dependent name."  On information and belief, as set forth above, Defendant has caused downstream intermediate cache servers and endpoint caches to send conditional GET requests with If-None-Match headers containing ETags and URIs including fingerprints that are fielded by upstream cache or origin servers.  On information and belief, the ETags and URIs including fingerprints were content-dependent names for a data item calculated by hashing the file's contents; and when the file's content changed a new content-dependent name was determined.  On information and belief, in Defendant's system, a first computer, such as the intermediate cache server or origin server, received such conditional GET requests from a second computer, such as a user browser, regarding data items, such as index or asset files, using content-dependent names such as ETags and URIs including fingerprints associated with the data items.

54.    Claim 69 then recites "(b) in response to said request: (i) to cause the content-dependent name of the data item to be compared to a plurality of values; and (ii) to determine if access to the data item is authorized or unauthorized based on whether or not the content-dependent name corresponds to at least one of said plurality of values, and (iii) based on whether

16

or not it is determined that access to the data item is authorized or unauthorized, to allow the data item to be provided to or accessed by the second computer if it is not determined that access to the data item is unauthorized."   On information and belief, the first computer, such as an upstream intermediate cache server or origin server, maintained a plurality of URI values associated with Defendant's asset and index files; compared the URI values received in a conditional GET request from the second (downstream) computer to that plurality of URI values; that comparison allowed the first computer to determine whether the content-dependent name in the request corresponded to one of the plurality of stored URI values and to determine whether access to the data item was still authorized or not.  On information and belief, in particular when there was a match, the first computer determined the associated content present at the downstream computer was still authorized to be used/served or whether new authorized content must be provided thereto.  If it was determined that the data item corresponding to the received URI including a fingerprint was still authorized to be used, the first computer has sent back an HTTP 304 message authorizing the downstream cache server or end-user cache to access the file content already present in order to serve it or to use it to render the webpage.  On information and belief, if it had been determined that the data item corresponding to the received URI including a fingerprint was no longer authorized, the first computer sent back an HTTP 200 message which indicated to the downstream cache server or end-user cache that was not authorized to access the old content and must access the new authorized file content contained in the HTTP 200 message to serve it or to use it to render the webpage.

55.    Defendant's acts of infringement have caused damage to PersonalWeb and PersonalWeb is entitled to recover from Defendant the damages sustained by PersonalWeb as a result of Defendant's wrongful acts in an amount subject to proof at trial.

## THIRD CLAIM FOR RELIEF

## INFRINGEMENT OF U.S. PATENT NO. 7,945,544

56.    PersonalWeb repeats and realleges paragraphs 1-37, as if the same were fully stated herein.

57.     On May 17, 2011, United States Patent No. 7,945,544 (the "'544 patent") was duly and legally issued for an invention entitled "Similarity-Based Access Control of Data in a Data Processing System."   PersonalWeb has an ownership interest in the '544 patent by assignment, including the exclusive right to enforce the '544 patent within the PersonalWeb Patent Field, and continues to hold that ownership interest in the '544 patent.   A true and correct copy of the '544 patent is attached hereto as Exhibit C.

58.     Defendant has infringed at least claims 46, 48, 52, and 55 of the '544 patent by its manufacture, use, sale, importation, and/or offer for sale of products or services, and/or controlling the distribution of its webpage content in the manner described herein.   Defendant's infringement is literal and/or under the doctrine of equivalents and Defendant is liable for its infringement of the '544 patent pursuant to 35 U.S.C. § 271.

59.     For example, claim 46 covers a claimed "computer-implemented method."   On information and belief, Defendant uses the claimed computer implemented method by using a system of notifications and authorizations to locate and control the distribution of data items, such as various index and asset files, necessary to render its webpages.

60.     Claim 46 then recites the act of "(A) for each particular file of a plurality of files: (a2) determining a particular digital key for the particular file, wherein the particular file comprises a first one or more parts."   On information and belief, each of Defendant's webpages comprises one or more asset files and has an associated index file, the index file containing the URIs having fingerprints of a plurality of asset files comprising the webpage, and once the index and asset files are compiled and complete, Defendant uploads them to the S3 host system as objects.   On information and belief, the index file's associated ETag value is generated by applying a hash algorithm to the index file's contents, wherein any two index files comprising the identical content will have identical associated ETag values.   On information and belief, whenever a new index file is uploaded to an S3 server or the index file's content changes, Defendant caused an ETag to be determined and associated to the index file at the time of upload.   On information and belief, this applies also to webpage's ETag, which is generated

when its index file is uploaded.

61.     Claim 46 then recites "each part of said first one or more parts having a corresponding part value, the part value of each specific part of said first one or more parts being based on a first function of the contents of the specific part, wherein two identical parts will have the same part value as determined by the first function, and wherein the particular digital key for the particular file is determined using a second function of the one or more of part values of said first one or more parts." On information and belief, prior to various asset files being uploaded to the S3 host system, a fingerprint is generated for each of these asset files by applying a hash function to the asset file's contents and the fingerprints are inserted into the URIs for the respective asset files.  On information and belief, the webpage's ETag value is generated by applying a second hash function to the index file's contents, which consist of the URIs of one or more of the asset files which comprise the webpage's contents.  On information and belief, because the respective asset file's URIs include the fingerprints of their content, the webpage's ETag value will change and a new associated ETag value is generated to represent the webpage's content, when the content changes and two identical webpages having the identical content represented by their index file will have the same ETag value.

62.     Claim 46 then recites the act of "(a2) adding the particular digital key of the particular file to a database, the database including a mapping from digital keys of files to information about the corresponding files."  On information and belief, Defendant caused the origin server, intermediate caches and browser caches to maintain databases/tables which mapped the ETag of each webpage's index file to its URI, and information about the corresponding webpage, such as, for example, cache control information for the webpage.

63.     Claim 46 then recites "(B) determining a search key based on search criteria, wherein the search criteria comprise a second one or more parts, each of said second one or more parts of said search criteria having a corresponding part value, the part value of each specific part of said second one or more parts being based on the first function of the contents of the specific part, and wherein the search key is determined using the second function of the one or more of

part values of said second one or more parts."  On information and belief, when a downstream intermediate cache server or a browser again requested a webpage of Defendant, Defendant caused it to send a conditional GET request with an If-None-Match header with the webpage's associated ETag value.  On information and belief, the received ETag value was determined using the second hash function of the webpage's index file, which includes URIs including fingerprints for one or more of the asset files which comprise the webpage's contents.

64.    Claim 46 then recites "(C) attempting to match the search key with a digital key in the database."  On information and belief, when the responding server receives the webpage's ETag value in a conditional GET request with an If-None-Match header, it compares the received ETag with the ETags it has maintained in a database/table corresponding to the URI of the webpage's index file to determine if there is matching value for that webpage.

65.    Claim 46 then recites "(D) if the search key matches a particular digital key in the database, providing information about the file corresponding to the particular digital key."  On information and belief, if the responding server has a matching ETag value for the webpage's index file, the responding server sends an HTTP 304 message, which includes information about the corresponding webpage, such as, for example, cache control information for the webpage.

66.    Defendant's acts of infringement have caused damage to PersonalWeb and PersonalWeb is entitled to recover from Defendant the damages sustained by PersonalWeb as a result of Defendant's wrongful acts in an amount subject to proof at trial.

## FOURTH CLAIM FOR RELIEF

## INFRINGEMENT OF U.S. PATENT NO. 8,099,420

67.    PersonalWeb repeats and realleges paragraphs 1-37, as if the same were fully stated herein.

68.    On January 17, 2012, United States Patent No. 8,099,420 (the "'420 patent") was duly and legally issued for an invention entitled "Accessing Data in a Data Processing System." PersonalWeb has an ownership interest in the '420 patent by assignment, including the exclusive right to enforce the '420 patent within the PersonalWeb Patent Field, and continues

20

to hold that ownership interest in the '420 patent.  A true and correct copy of the '420 patent is attached hereto as Exhibit D.

69.     Defendant has infringed claims 25, 26, 27, 29, 30, 32, 34-36, and 166 of the '420 patent by its manufacture, use, sale, importation, and/or offer for sale of products or services, and/or controlling the distribution of its webpage content in the manner recited herein. Defendant's infringement is literal and/or under the doctrine of equivalents and Defendant is liable for its infringement of the '420 patent pursuant to 35 U.S.C. § 271.

70.     For example, claim 166 covers a "system comprising hardware, including at least a processor, and software, in combination with said hardware."  On information and belief, Defendant has controlled the distribution of its website content across a system that included hardware including a processor, such as its production servers as well as origin servers, intermediate cache servers, and endpoint caches; and software, in combination with such hardware, including Ruby on Rails used in making its webpages, software utilized in implementing the HTTP web protocol, and the software used on the Amazon S3 host servers that Defendant used to serve its webpages.

71.     Claim 166 then recites "(A) for a particular data item in a set of data items, said particular data item comprising a corresponding particular sequence of bits."  On information and belief, Defendant's system has controlled the distribution of asset files and index files necessary to render its webpages which represent particular data items, and each of these files comprise a corresponding sequence of bits.

72.     Claim 166 then recites that for the particular data item to "(a1) determine one or more content-dependent digital identifiers for said particular data item, each said content-dependent digital identifier being based at least in part on a given function of at least some of the bits in the particular sequence of bits of the particular data item, wherein two identical data items will have the same digital identifiers as determined using said given function."  On information and belief, Defendant's system has applied hash functions to each of the Defendant's webpage files to all of the bits of the file's content to determine both a fingerprint and an ETag for the

file's content; whereby two identical data items have the same ETag and fingerprint values.  On information and belief, the fingerprint was included in the file's URI and the ETag value was associated with the file's URI.

73.    Claim 166 then recites that for the particular data item "(a2) selectively permits the particular data item to be made available for access and to be provided to or accessed by or from at least some of the computers in a network of computers, wherein the data item is not to be made available for access or provided without authorization, as resolved based, at least in part, on whether or not at least one of said one or more content-dependent digital identifiers for said particular data item corresponds to an entry in one or more databases, each of said one or more databases comprising a plurality of identifiers, each of said identifiers in each said database corresponding to at least one data item of a plurality of data items, and each of said identifiers in each said database being based, at least in part, on at least some of the data in a corresponding data item."

74.    On information and belief, Defendant's system has included one or more webpage servers with databases containing ETag values associated with the various URIs for all of the asset and index files necessary to render its webpages; moreover, Defendant's system has used a system of conditional GET requests with If-None-Match headers and HTTP 304 and HTTP 200 messages containing the ETags, as described more particularly *supra*, to ensure that downstream caches only access authorized file content to either serve that file content further downstream or to use it to render Defendant's webpages.  On information and belief, in particular, as more fully described *supra*, the system compared the ETag received in a given conditional GET request with the ETags contained in the database to selectively determine whether the requesting computer could access the file content it already had or must access newly received authorized content.

75.    Defendant's acts of infringement have caused damage to PersonalWeb and PersonalWeb is entitled to recover from Defendant the damages sustained by PersonalWeb as a result of Defendant's wrongful acts in an amount subject to proof at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff PersonalWeb requests entry of judgment in its favor and against Defendant as follows:

a)      Declaration that Defendant has infringed U.S. Patent Nos. 6,928,442, 7,802,310, 7,945,544 and 8,099,420 as described in this action;

b)      Awarding the damages arising out of Defendant's infringement of U.S. Patent Nos. 6,928,442, 7,802,310, 7,945,544 and 8,099,420, together with pre-judgment and post-judgment interest, in an amount according to proof;

c)      An award of attorneys' fees pursuant to 35 U.S.C. § 285 or as otherwise permitted by law; and

d)      For costs incurred and such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff PersonalWeb Technologies, LLC hereby demands a trial by jury on all issues triable in this action.

Dated: May 29, 2018

Of Counsel:

Michael A. Sherman
Jeffrey F. Gersh
Sandeep Seth
Wesley W. Monroe
Viviana Boero Hedrick
STUBBS ALDERTON
& MARKILES, LLP
15260 Ventura Blvd., 20th Floor
Sherman Oaks, CA  91403
Telephone: (818) 444-4500
Facsimile: (818) 444-4520
masherman@stubbsalderton.com
jgersh@ stubbsalderton.com
sseth@ stubbsalderton.com
wmonroe@ stubbsalderton.com
vhedrick@ stubbsalderton.com

Respectfully submitted,

FARNAN LLP

/s/ Brian E. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 North Market Street
12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Attorneys for Plaintiffs*